IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

EQUAL EMPLOYMENT OPPORTUNITY          *
COMMISSION,
                                      *
        Plaintiff,
                                      *         CASE NO. 3:08-CV-53 (CDL)
KATHRYN MCKILLIP,
                                      *
        Plaintiff-Intervenor,
                                      *
vs.
                                      *
SDI ATHENS EAST, LLC, d/b/a
Sonic, and TOMCO MANAGEMENT,          *
LLC,
                                      *
        Defendants.
                                      *

O R D E R

This action is based on allegations that a general manager at a Sonic Drive-In restaurant sexually harassed Plaintiff-Intervenor Kathryn McKillip ("McKillip") while she was employed there, and that she was constructively discharged from her employment because of the sexually hostile work environment.  Plaintiff Equal Employment Opportunity Commission ("EEOC"), along with McKillip (collectively, "Plaintiffs"), bring claims of hostile work environment, constructive discharge, and punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), against McKillip's alleged employers, Defendants SDI Athens East, LLC d/b/a Sonic ("SDI Athens") and TomCo Management, LLC ("TomCo") (collectively, "Defendants").  Defendants contend that they are entitled to summary judgment as to all claims and have filed the

present Motion for Summary Judgment (Doc. 36).  For the following reasons, the Court finds that genuine issues of material fact exist to be tried.  Therefore, Defendants' motion is denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In determining whether a *genuine* issue of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

The facts viewed in the light most favorable to the EEOC and McKillip reveal the following.

**I.  The Harassment**

In March of 2004, McKillip began working as a "fountain" at the Sonic Drive-In restaurant franchise located at 4340 Lexington Road, Athens, Georgia 30605 (the "Restaurant").  (McKillip Dep. 11:4-23,

2

May 4, 2009.) McKillip's duties as a fountain included making drinks and desserts. (*Id.* at 13:6-8.) At that time, McKillip was eighteen years old and the Restaurant was her first job. Maurice Hockey joined the Restaurant as general manager in mid-November of 2005.[1] Shortly after Hockey became general manager at the Restaurant, he promoted McKillip to a "carhop." (Hockey Dep. 84:21-85:3, May 20, 2009.) McKillip's duties as a carhop included carrying food out to customers in their cars. (McKillip Dep. 13:9-11.)

At all relevant times, Hockey was the general manager, Matt Gray was the first assistant manager (Gray Dep. 15:11-16:5, May 21, 2009), and Harrison Mitchell was the assistant manager (Mitchell Dep. 18:23-19:12, May 21, 2009). The supervisory chain of command at the Restaurant began at the lowest level and moved up as follows: assistant manager, first assistant manager, general manager, and the Director of Operations/Owners. (Gray Dep. 16:23-17:3; Ex. A to Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. [hereinafter Defs.' SOF], Burns Aff. ¶ 7, July 20, 2009.)

McKillip contends that Hockey sexually harassed her over the four-month period Hockey and McKillip worked together before she left the Restaurant in March of 2006. (*See, e.g.*, Ex. K to Pls.' Resp. to Defs.' Mot. for Summ. J. [hereinafter Pls.' Resp.], McKillip Decl. ¶

---

[1]Both Hockey's "Date of Hire" and "Actual First Day of Work" was November 11, 2005. (Ex. I to Pls.' Resp. to Defs.' Mot. for Summ. J. [hereinafter Pls.' Resp.], Completed Form for Ga. New Hire Reporting Program.)

6, Sept. 2, 2009 ("Within the first few weeks of starting at SDI Athens Maurice Hockey began making sexual advances towards me.").) The instances of harassment are as follows:

- On multiple occasions, Hockey hugged McKillip tightly. (McKillip Dep. 52:2-7.) In response, McKillip would freeze up and say "nothing." (*Id.* at 52:24-53:1; *see* McKillip Decl. ¶ 6.) McKillip "never made eye contact" and "looked down because [she] was repulsed by Hockey's advances and did not want to do anything that he might interpret as encouragement." (McKillip Decl. ¶ 7.)

- On one occasion, Hockey asked McKillip if she was having sex with her boyfriend. (McKillip Dep. 54:13-55:4.) McKillip did not say anything to Hockey but "just looked at him like he was gross." (*Id.* at 55:5-7.)

- On one occasion, Hockey told McKillip that if she were not "fucking" her boyfriend, another employee of the Restaurant, she would be doing her job better. (*Id.* at 55:10-56:6.) McKillip said nothing in response but "just looked at him." (*Id.* at 56:7-9.)

- On several occasions, Hockey stood very close to McKillip with his body up against her. (*Id.* at 58:23-59:4.) McKillip would say nothing to Hockey but would "just kind of pull[] away." (*Id.* at 59:18-20.)

- On one occasion, McKillip overhead Hockey tell other Restaurant employees that he wanted a picture of her naked with everyone "standing around pissing" on her. (*Id.* at 61:2-18, 62:1-2; Ex. I to Defs.' SOF, EEOC Aff., Mar. 26, 2007.) McKillip said nothing to Hockey but "just got [her] food and walked out the door." (McKillip Dep. 61:19-22.)

- On one occasion, Hockey slapped McKillip on her butt. (*Id.* at 62:3-13.)

- On several occasions, Hockey, in McKillip's presence, told other female employees to "shake their money maker."[2] (*Id.*

---

[2]Hockey admits that the term "money maker" refers to a female's "butt." (Hockey Dep. 119:20-21.) This term was directed to female employees only. (McKillip Decl. ¶ 11.)

4

at 64:4-12, 64:23-65:1; McKillip Decl. ¶ 11; Hockey Dep. 119:11-21.)

- On several occasions, Hockey called McKillip derogatory nicknames such as "short shit" and "munchkin."[3] (McKillip Dep. 56:11-57:9; McKillip Decl. ¶ 8; Hockey Dep. 118:2-6.) In response, McKillip "would just look away and walk away." (McKillip Dep. 57:3-9.)

- On one occasion, Hockey picked McKillip up and said he was going to put her in the trash. (*Id.* at 57:10-22.) McKillip told Hockey "to put [her] down" and she "just walked away." (*Id.* at 57:18-22.)

- On one occasion, Hockey put his arm around McKillip's neck and put her in a chokehold. (*Id.* at 60:1-17.) In response, McKillip told Hockey "to F off and get off of [her]." (*Id.* at 60:18-22.)

At some point after the alleged harassment began, McKillip complained to assistant manager Mitchell about Hockey's inappropriate conduct.[4]  Specifically, McKillip told Mitchell that Hockey had "slapped [her] on [her] behind" and that he was "touching [her] and hugging [her]." (*Id.* at 66:9-15.) In response, Mitchell told her that "[she] should do something about it." (*Id.* at 66:25-67:1.) It is undisputed that while McKillip was employed at the Restaurant, no

_____

[3]Hockey is approximately five feet and five inches tall and perceived McKillip as "small." (Hockey Dep. 106:25-107:4, 107:9-10.) Hockey knew that McKillip took offense at demeaning references to her height. (*Id.* at 184:10-185:11.)

[4]McKillip does not recall when she complained to Mitchell, but it was sometime while she was still employed with the Restaurant. (McKillip Dep. 66:4-21.)
Mitchell contends that McKillip never "complain[ed] to [him] about sexual misconduct or inappropriate behavior by Maurice Hockey during her employment at the Restaurant." (Ex. K to Defs.' SOF, Mitchell Aff. ¶ 4, Oct. 8, 2008.)

investigation was done regarding McKillip's complaint of Hockey's alleged harassing conduct.

## II.   Termination of McKillip's Employment

McKillip became "withdrawn" and "wasn't very personable" with customers.  (*Id.* at 97:11-14.)  McKillip testified that it became very stressful to work and that she began looking for other employment because of the hostile environment.  (*Id.* at 94:5-14.)  On March 15, 2006, McKillip finally left the Restaurant because she could not endure Hockey's harassing conduct any longer.  (*Id.* at 88:6-90:8; McKillip Decl. ¶ 12 ("After months of enduring Hockey's constant advances and increasingly crude and abusive behavior, I could not tolerate working with him any longer and left SDI Athens in March of 2006.").)  McKillip filed a charge of discrimination with the EEOC on July 13, 2006.  (Ex. L to Defs.' SOF, Charge of Discrimination, July 13, 2006.)  SDI Athens was the only employer listed on the EEOC Charge.  (*Id.*)

## III.  The Restaurant's Policies, Procedures, and Training Regarding Sexual Harassment

At all times relevant to this case, the Restaurant's employee handbook contained a "Harassment-Free Workplace" policy prohibiting harassment and discrimination.  (Burns Aff. ¶¶ 11-12; *see* Ex. 2 to Burns Aff., Harassment-Free Workplace Policy.)  The policy provided in part:

> If you believe that you have been discriminated against or harassed by a co-worker, manager, supervisor, customer, vendor, or any other individual in a work-related

environment, you should immediately report the incident to
your immediate supervisor.   If, for any reason, you are
uncomfortable going to your immediate supervisor, or if you
are not satisfied with the results you received from your
immediate supervisor, you should immediately proceed to
your next level supervisor, or any level of supervisor with
management responsibilities over the drive-in, or the
drive-in's owner.

(Harassment-Free Workplace Policy at 1.)   Approximately nine months after McKillip started working at the Restaurant, she signed an acknowledgment form stating that she received a copy of the employee handbook.   Although she signed the acknowledgment form (Ex. M to Pls.' Resp., McKillip's Employee Acknowledgment Form, Dec. 7, 2004), McKillip never received a copy of the handbook (McKillip Dep. 77:11-23).[5]

At all times relevant to this case, the Restaurant had a bulletin board hanging on the back wall that contained a poster titled "Sexual Harassment is Illegal." (Burns Aff. ¶ 20; *see* Ex. 5 to Burns Aff., Sexual Harassment is Illegal Poster.)   The poster stated:

Sexual harassment is unlawful and unacceptable in the
workplace. Unwelcome sexual advances, requests for sexual
favors, and other verbal and physical conduct of a sexual
nature constitute sexual harassment.

Sexual harassment is illegal whether it is initiated by a
supervisor, a manager, a coworker, or any non-employee.

Because of the importance we place on these types of
issues, this company has instituted a procedure for

_____

[5]Defendants contend that it was the policy of the Restaurant to
require all new employees to read the employee handbook and execute an
acknowledgment before beginning work at the Restaurant. (Burns Aff. ¶
13.)

7

> investigating harassment complaints.  It is our policy to
> investigate and resolve these issues in a prompt manner.
> If you have been harassed, or another's conduct creates an
> intimidating, hostile, or offensive work environment,
> please notify one of the people listed below immediately.

(Sexual Harassment is Illegal Poster at 1.)  The poster displayed the

names and phone numbers of Roger Thomas, principal owner of SDI

Athens, and Lance Burns, Director of Operations of SDI Athens, as

contacts to call to report a sexual harassment issue.  (*Id.*)  The

poster was approximately forty feet from the fountain station (Burns

Aff. ¶ 23(c)), thirteen feet from the onion ring preparation area

(*id.* ¶ 23(d)), and five feet from the coffee cup storage area (*id.* ¶

23(e)).  Although McKillip worked at all three areas throughout her

employment at the Restaurant (McKillip Dep. 21:18-24, 22:12-16, 23:3-

5), she never saw the poster (*id.* at 82:22-83:7, 120:15-22; McKillip

Decl. ¶ 3).

Restaurant management conducted monthly meetings where they

discussed "menu changes" or "new promotions" with the staff.

(McKillip Decl. ¶ 5.)  McKillip does not "ever remember a staff

meeting at which [the staff] discussed the sexual harassment policy

or procedure." (*Id.*)  Hockey received his first training on sexual

harassment after McKillip filed her EEOC Charge of Discrimination.

(Hockey Dep. 151:2-12.)

**IV.  The Defendants**

SDI Athens is a limited liability company organized under the

laws of the state of Georgia by Thomas and Burns in December 2002.

(Burns Aff. ¶ 2; *see* Ex. 1 to Burns Aff., SDI Athens Certificate of Org.)  Thomas is the principal owner of SDI Athens.  (Thomas Dep. 23:17-21, May 22, 2009; Burns Dep. 11:12-17, May 22, 2009.)  The business purpose of SDI Athens is to own and operate the Restaurant.  (Burns Aff. ¶ 4.)  Burns is the Director of Operations for SDI Athens as well as the joint owner of SDI Athens with Thomas and other individuals.  (*Id.* ¶¶ 2 & 5.)

TomCo is a foreign limited liability company organized under the laws of the state of Tennessee by Thomas in 2000, and it is authorized to transact business in Georgia.  (Ex. B to Defs.' SOF, Thomas Aff. ¶¶ 2-3, July 20, 2009; *see* Ex. 1 to Thomas Aff., TomCo Certificate of Authority to Transact Business.)  TomCo has only three employees.  (Thomas Dep. 17:11-13.)  Thomas, the chief manager of TomCo (Thomas Aff. ¶ 4), organized TomCo to, among other things, provide administrative services to several Sonic Drive-In franchises, including the Restaurant (Thomas Dep. 10:6-11:13).  TomCo has no ownership interest in the Restaurant or any other Sonic Drive-In franchise location.  (Thomas Aff. ¶ 6.)  The administrative services TomCo provides include "[p]ayroll, accounts payable, [and] things of that nature."  (Thomas Dep. 8:13-16.)  TomCo receives a monthly accounting and management fee for its administrative services.  (*Id.* at 12:12-18.)  Although SDI Athens and TomCo have separate banking accounts (Thomas Aff. ¶ 9), TomCo keeps the complete financial records for all Sonic Drive-in restaurants it manages, including the

Restaurant (Thomas Dep. 23:10-13).  Further, Thomas stated that he "probably" has veto power over the hiring and firing of general managers at the Restaurant.  (Thomas Dep. 9:12-14.)  Finally, Thomas makes decisions regarding the operation of the Restaurant.  (Thomas Aff. ¶ 10.)  It is disputed, however, whether Thomas makes these decisions in his capacity as chief manager of TomCo or in his capacity as principal owner of SDI Athens.  (Pls.' Resp. to Defs.' Statement of Material Facts ¶ 18.)

DISCUSSION

Plaintiffs bring claims of sexually hostile work environment, constructive discharge, and punitive damages against Defendants. Defendants contend that they are entitled to summary judgment as to all claims for several reasons: (1) TomCo contends that it was not McKillip's employer and therefore is not liable for any alleged Title VII violations; (2) both Defendants contend that Plaintiffs have failed to produce enough evidence from which a reasonable factfinder could conclude that McKillip suffered from a hostile work environment; (3) both Defendants contend that McKillip was not constructively discharged from her job at the Restaurant; and (4) both Defendants contend that Plaintiffs' claim for punitive damages under Title VII fails as a matter of law.  The Court will address each contention in turn.

## I.   McKillip's Employer

TomCo argues that summary judgment should be entered in its favor because it was not McKillip's employer and, as such, is not liable for any alleged violations of Title VII.  (Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. [hereinafter Defs.' Mem.] 3-6; Defs.' Am. Reply Br. in Supp. of Defs.' Mot. for Summ. J. 10 n.3.) It is undisputed that TomCo employs less than fifteen employees as required to be an "employer" under 42 U.S.C. § 2000e(b) (Thomas Dep. 17:11-13), and that McKillip failed to file an EEOC Charge of Discrimination against TomCo (*see* EEOC Charge of Discrimination). However, Plaintiffs contend that TomCo and SDI Athens should be considered a single employer for Title VII purposes.[6] (Pls.' Resp. 19-20.)   In determining whether multiple entities should be considered a single employer for Title VII purposes, the Eleventh Circuit evaluates four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987).  "[N]ot every factor need be present, and no single factor is controlling." *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 n.5 (11th Cir. 1999) (en banc).

---

[6]Defendants do not dispute that SDI Athens was McKillip's employer for Title VII purposes.  (Defs.' Mem. 4.)

Examining the four factors in this case, the Court finds that the evidence in the present record is sufficient for a reasonable factfinder to conclude that TomCo and SDI Athens are a single employer for Title VII purposes.  First, TomCo and SDI Athens have an interrelation of operations.  Although the two companies do not share office space, bank accounts, telephone numbers, or equipment, there is evidence that TomCo keeps the complete financial records for the Restaurant.  Further, Thomas, the chief manager of TomCo and principal owner of SDI Athens, formed TomCo for the express purpose of managing several Sonic Drive-Ins, including the Restaurant. (Thomas Dep. 10:6–11:13.)  Next, TomCo and SDI Athens have both a centralized control of labor relations and common management.  A reasonable factfinder could conclude from the present record that Thomas, as chief manager of TomCo, maintained veto power over the hiring of general managers at the Restaurant. *See, e.g., Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244–45 (11th Cir. 1998) (focusing on "degree of control an entity has over the adverse employment decision on which the Title VII suit is based").  Finally, there is evidence from which a reasonable factfinder could conclude that TomCo and SDI Athens have common ownership.  Thomas not only formed SDI Athens and was its principal owner, but he also formed TomCo and was its chief manager. *See, e.g., McKenzie*, 834 F.2d at 933–34 (finding that there were genuine issues of material fact as to single employer theory where plaintiff pointed to evidence of common

12

ownership and management).  For these reasons, the Court finds that genuine issues of material fact exist to be tried as to whether TomCo and SDI Athens should be treated as a single employer for Title VII purposes.

## II.   Sexually Hostile Work Environment

To establish a sexually hostile work environment claim under Title VII based on harassment by a supervisor, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).  It is undisputed that McKillip, a female, belongs to a protected group.  Defendants contend, however, that the harassment was not unwelcome, that most of the harassment was not based on McKillip's sex, that the level of harassment was not sufficiently severe or pervasive to alter the terms and conditions of McKillip's employment, and that there is no basis to hold Defendants liable for Hockey's conduct.  The Court will address each of these contentions in turn.

A.   Unwelcome Sexual Harassment

Defendants contend that Plaintiffs have failed to establish that Hockey's acts of harassment were unwelcome.  (Defs.' Mem. 11-12.)

13

"In order to constitute harassment, th[e] conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982).   Here, there is no evidence in the record that McKillip "solicit[ed]" or "incite[d]" the harassment.   Although Defendants contend that McKillip "did nothing that would indicate that the alleged misconduct was unwelcome" (Defs.' Mem. 11), there is sufficient evidence in the record from which a reasonable factfinder could conclude that McKillip expressed her displeasure by either walking away from Hockey, giving him looks of disapproval, or on at least two occasions telling Hockey not to touch her.   Therefore, based on the present record, a reasonable factfinder could conclude that Hockey's alleged acts of harassment were unwelcome.

B.   Harassment Based on McKillip's Sex

Defendants next contend that several of Hockey's alleged comments and instances of behavior were not sexual in nature and therefore should not constitute actionable sexual harassment. (Defs.' Mem. 7-8.)   Specifically, Defendants contend that the allegations that Hockey called McKillip derogatory names such as "short shit," that he picked her up and said he was going to put her in the trash, and that he put his arm around her neck in a chokehold "may amount to annoying teasing and horseplay at work, but such

14

conduct is not sexual in nature and thus, . . . should be disregarded." (*Id.* at 8.)

"In proving a claim for a hostile work environment due to sexual harassment, . . . the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment." *Henson*, 682 F.2d at 904; *see Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1153 (11th Cir. 2009) ("Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party . . . are not counted." (alteration in original) (internal quotation marks omitted)). There is ample evidence that Hockey's conduct was overtly sexual in nature. Hockey slap McKillip on her butt and hugged her numerous times. Looking at Hockey's behavior toward McKillip and the context of his conduct, there is sufficient evidence in the record from which a reasonable factfinder could conclude that "but for the fact of her sex," McKillip would not have been subject to Hockey's alleged harassment. *Henson*, 682 F.2d at 904.

Furthermore, although Defendants contend that Hockey's conduct was not sexual in nature and was mere "horseplay," there is evidence in the record from which a reasonable factfinder could conclude that Hockey's conduct was based on McKillip's sex and exceeded any reasonable bounds of appropriate behavior in the workplace. Not only did Hockey physically intimidate McKillip in a sexually charged manner, but he also called her demeaning names with sexual overtones

despite the fact he was aware that she took offense to such teasing. In contrast, there is *no* evidence in the record to even suggest that Hockey physically intimidated or humiliated males in the workplace. *Cf. Mendoza*, 195 F.3d at 1248 n.5 (suggesting that female plaintiff may demonstrate that acts of harassment were based on her sex by introducing evidence that harassing employer treated women employees differently than male employees); *see also Reeves v. C.H. Robinson Worldwide Inc.*, No. 07-10270, 2010 WL 174074, at *10 (11th Cir. Jan. 20, 2010) (en banc) (stating plaintiff "had a right not to suffer conditions in the workplace that were disparately humiliating, abusive, or degrading"); *id.* ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." (internal quotation marks omitted)). Therefore, the Court finds that a reasonable factfinder could conclude based on the evidence that the harassment was based on McKillip's sex.

   C.   Severity and Pervasiveness

   Plaintiffs must produce evidence from which a reasonable factfinder could conclude that the harassing conduct was both subjectively and objectively severe or pervasive. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). This requires Plaintiffs to produce evidence from which a reasonable factfinder could conclude that (1) McKillip subjectively perceived her work

environment to be hostile or abusive, and (2) a reasonable person would find the environment hostile or abusive.  *Id.*

### 1.   Subjective Component

"Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive[.]"  *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000).  Here, McKillip not only perceived her harassment as severe and pervasive, she also found her work environment unbearable.  Specifically, McKillip testified,

> While I was working at Sonic, at first when he started to comment to me and when he started touching me, I tried to shrug it off and just ignore him.  But it happened so often, it started to really put me in a bad mood when I started to come to work.  I started to not want to come to work.  I started feeling depressed.  I couldn't tell anybody because I was ashamed about it.  He would have people laughing at me, so it was embarrassing to me, some of the things that he was saying.  When I would go in to work and look on the schedule and his name would be there, it would really upset me, and I would just want to go home.  It came to the point where I didn't even want to work.  I didn't want to come to work.

(McKillip Dep. 94:19-95:8.)  Therefore, the Court finds that based on the present record, a reasonable factfinder could conclude that McKillip subjectively perceived her work environment to be hostile.

### 2.   Objective Component

In evaluating the objective severity of the harassment, the Court considers four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4)

17

whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276.  A court must consider the alleged conduct "in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246.  Construing the facts in the light most favorable to the EEOC and McKillip, the Court finds that genuine issues of material fact exist regarding the objective severity and pervasiveness of the alleged harassment.

First, there is evidence from which a reasonable factfinder could conclude that the harassment occurred relatively frequently over the four-month period Hockey and McKillip worked together. McKillip testified that Hockey repeatedly touched her and made numerous offensive comments.  Importantly, Hockey directly supervised McKillip and worked in the same area, further supporting the conclusion that the harassment occurred frequently.  The Court also finds that there is sufficient evidence from which a reasonable factfinder could conclude that the harassment was sufficiently severe.   Hockey's comments were laced with profanities and accompanied by sexually suggestive physical actions.  There is also evidence that Hockey touched McKillip in a sexual manner throughout the four-month period they worked together.

18

Second, there is evidence that Hockey's conduct was both humiliating and physically threatening. Hockey not only touched McKillip and threatened her with bodily harm, but he also made several vulgar comments to McKillip while she was employed at the Restaurant. His demeaning and humiliating behavior included questions about her sex life and occurred during work hours in front of other employees.

Finally, the Court finds that a reasonable factfinder could conclude that Hockey's harassment unreasonably interfered with McKillip's job performance. McKillip testified that because of Hockey's conduct, she felt "withdrawn" and "wasn't very personable" with customers. McKillip also stated that Hockey's harassment caused her stress and eventually compelled her to quit her job at the Restaurant.

Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there is sufficient evidence from which a reasonable factfinder could conclude that Hockey's alleged conduct was sufficiently severe or pervasive to establish a sexually hostile work environment. Now the Court must determine whether a legal basis exists for holding Defendants liable for Hockey's harassment.

D.   Employer Liability: *Faragher/Ellerth* Affirmative Defense

Even if an employee establishes the existence of a hostile work environment, the employer is not automatically liable. An employer may raise the affirmative defense to vicarious liability announced by

19

the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998) ("*Faragher/Ellerth* defense"). When no tangible employment action is taken by an employer, that employer may raise the *Faragher/Ellerth* defense, subject to proving by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1296-97 (11th Cir. 2000) (internal quotation marks omitted). "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001).[7]

> 1. *Reasonable Care to Prevent and Correct Harassing Behavior*

With regard to the first element of the *Faragher/Ellerth* affirmative defense, "the Supreme Court implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy." *Madray*, 208 F.3d at 1297-98. Here, Defendants

---

[7]The *Faragher/Ellerth* affirmative defense may be asserted against both the hostile work environment claim and the constructive discharge claim. *See Pa. State Police v. Suders*, 542 U.S. 129, 133, 144-149 (2004).

had in place an adequate anti-harassment policy that included a complaint procedure, as well as a poster that explained Defendants' sexual harassment policy.  However, while proof that an employer has formulated an anti-harassment policy with a complaint procedure is relevant in determining whether an employer may escape liability, the mere existence of a policy alone is not sufficient; the policy must also be promulgated. *See Faragher*, 524 U.S. at 808 (denying employer affirmative defense because employer "entirely failed to disseminate its [sexual harassment] policy").

In this case, there are genuine factual disputes concerning whether Defendants took steps to promulgate their policy sufficiently.  McKillip stated that she never received the policy or saw a poster displaying Defendants' anti-harassment policy at the Restaurant.  She also testified that she never received sexual harassment training while employed at the Restaurant.  Perhaps even more astonishing is Hockey's testimony that he received his first sexual harassment training *after* McKillip filed her EEOC Charge of Discrimination.  Therefore, the Court finds that there are genuine issues of material fact that preclude it from finding as a matter of law that Defendants exercised reasonable care in preventing the harassing conduct.

Genuine issues of material fact also exist as to whether Defendants acted reasonably to correct the harassment.  When correcting sexual harassment, "an employer need not act

21

instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick*, 246 F.3d at 1314. Furthermore, "the question of whether an employer timely acted to correct harassment turns on when it had proper notice of an employee's harassment complaint." *Id.* at 1315; *see, e.g.*, *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 422 (11th Cir. 1999) ("[T]he employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment . . . then it is liable unless it took prompt corrective action.").

A reasonable factfinder could conclude based on the present record that McKillip adequately notified Mitchell of Hockey's harassing conduct and her desire to have the conduct addressed. It is undisputed that neither Mitchell nor the Restaurant took any action in response to McKillip's complaint. For these reasons, the Court finds that there are genuine issues of material fact as to whether Defendants exercised reasonable care in correcting the harassing conduct. Since genuine issues of material fact exist as to whether Defendants reasonably acted to prevent and correct the harassment, it is not necessary to address the second prong of the affirmative defense. Nevertheless, for the sake of completeness, the Court addresses that prong, also.

22

2.   *Reasonable Care to Avoid Harassment*

Defendants must also show that McKillip unreasonably failed to take advantage of Defendants' complaint procedures. *Frederick*, 246 F.3d at 1315.  In analyzing whether McKillip properly reported the sexual harassment, the Court must determine whether she complained to the appropriate person at the Restaurant, and whether McKillip's conversation was sufficient to put the Restaurant on notice of the sexual harassment. *Olson v. Lowe's Home Ctrs. Inc.*, 130 F. App'x 380, 389-90 (11th Cir. 2005).  Here, a reasonable factfinder could conclude that Mitchell was an appropriate person to receive reports of harassment.  Although the poster provided that an employee should report harassment complaints to either Burns or Thomas (Sexual Harassment Is Illegal Poster at 1), Defendants' anti-harassment policy specifically provided that an employee may report harassing conduct to "any level of supervisor with management responsibilities over the drive-in" (Harassment-Free Workplace Policy at 1).  The Court also finds that there are genuine issues of material fact as to whether McKillip's conservation with Mitchell was sufficient to put Defendants on notice of Hockey's harassing conduct.  McKillip complained to Mitchell during work hours about Hockey's inappropriate conduct, telling Mitchell that Hockey had "slapped [her] on [her] behind" and that he was "touching [her] and hugging [her]." (McKillip Dep. 66:14-15.)  Although Defendants contend that McKillip's complaint to Mitchell was merely an informal conversation

23

and did not inform Mitchell of the extent of the alleged harassment, "[t]here is no magic word requirement" to place an employer on notice of offending behavior. *Olson*, 130 F. App'x at 391 n.22. Thus, although McKillip did not specifically label Hockey's inappropriate conduct as "sexual harassment," a reasonable factfinder could conclude that McKillip's conversation was sufficient to put Defendants on notice of Hockey's inappropriate conduct. Therefore, the Court finds that there are genuine issues of material fact as to whether McKillip's conversation with Mitchell was sufficient to put the Restaurant on notice of Hockey's harassing conduct.

In summary, the Court finds that genuine issues of material fact exist regarding both elements of the affirmative defense—(1) whether Defendants acted reasonably to prevent and correct promptly the harassing behavior, and (2) whether McKillip unreasonably failed to take advantage of Defendants' preventive or corrective opportunities. Accordingly, Defendants are not entitled to summary judgment based on their *Faragher/Ellerth* defense. Since genuine issues of material fact exist as to whether McKillip was subjected to a sexually hostile work environment and whether Defendants have satisfied the elements of their affirmative defense, summary judgment is denied.

## III. Constructive Discharge

In addition to the harm that McKillip suffered as a result of the sexually hostile work environment, Plaintiffs contend that McKillip was constructively discharged by being subjected to the

24

sexual harassment.  "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (internal quotation marks omitted).  "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).  "To prove constructive discharge, [Plaintiffs] must demonstrate that [McKillip's] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989).

At this stage of the proceedings and based on the present record, the Court finds that genuine issues of material fact exist as to whether McKillip was constructively discharged.  Therefore, Defendants' motion for summary judgment is denied as to this claim. The Court recognizes the heavy burden Plaintiffs have to carry on this claim and will, of course, reconsider this ruling at the time of trial depending upon the state of the evidence at that time.

## IV.  Punitive Damages

To recover punitive damages, a Title VII plaintiff must show that the employer engaged in "discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  "To get punitive damages, a Title VII plaintiff must show either that the

discriminating employer was high[] up the corporate hierarchy, or that higher management countenanced or approved his behavior[.]" *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999) (first alteration in original) (citation and internal quotation marks omitted).

Based on the present record and giving Plaintiffs the benefit of all favorable inferences, the Court cannot find that Defendants have demonstrated that no genuine issue of material fact exists as to Plaintiffs' entitlement to punitive damages.  Therefore, Defendants' motion is denied as to this claim.

CONCLUSION

For the previously stated reasons, Defendants' Motion for Summary Judgment (Doc. 36) is denied.

IT IS SO ORDERED, this 17th day of February, 2010.


S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE